The next argument is in Appeal 1554 from 2007, ASYST Technologies v. Emtrak. Mr. Wu will hear argument from you first. Good morning, welcome. Good morning Your Honor, thank you. Please proceed. May it please the Court. A tech-savvy Silicon Valley jury found the ASYST patent non-obvious and infringed. There was substantial evidence to back that jury's finding that the district court ignored and instead cast aside, substituting its own judgment for that of the jury, finding the invention obvious under a JMAL motion. The district court could hardly help itself from doing so after having lived with the case for 10 years. It's like if I told you the answer to a crossword puzzle in advance and then you tried to solve the puzzle without regard for the answer. Instead, the jury gave it a fresh look, found the patent non-obvious, and the court erred by not deferring to that jury. On JMAL, the court... I don't quite understand what you mean erred by not deferring to the jury. There's obviously no rule that the court must always defer to the jury and we all certainly can agree that the ultimate determination regarding obviousness is a matter of law and therefore in that final step of analysis, deference isn't required. So I'm trying to understand precisely what it is that you think that Judge Fogel did that's against the law that I allude to. Well, the patent was... There was certainly substantial evidence to back all the jury's findings, certainly on lack of motivation to combine and so forth. You think on the Hesser not being in the scope of the prior? Is that substantially supported? On that question, Your Honor, at the time maybe it was a close question. I think after KSR it may have been different, but the fact of the matter is it didn't affect any of the other answers that the jury had to answer. I don't know. It seems to me it may have affected the whole verdict. I mean, once you take Hesser away, it's hard for me to see how that doesn't make a huge difference in the way the jury views the question of obviousness. Hesser is the primary reference. True. If you take that away, it's pretty easy to find... But it wasn't taken away because... It was taken away by the virtue of the jury saying that they didn't consider it to be prior art. Well, within the scope. But the other questions, the questions of questions three and questions five, the ultimate question of whether or not you found the patent obvious, and the question of whether or not there was a motivation to combine Hesser with the other prior art, those questions presumed that Hesser and the prior art that was presented was within the scope. It's like asking you, you know, how often do you play tennis? And the question presumes that you play tennis. And that's exactly what those questions ask. And the jury never probably put it in their minds that they had to first find Hesser within the scope and then find whether or not there was a motivation to combine. It just answered the question that was presented to it, whether or not you thought Hesser and the other prior art, there was a motivation to combine that, a reason to combine that. And most assuredly, there was substantial evidence showing that there was no, there was enough evidence to show that there was no reason to combine that. And remember, this was all the defendant's burden. They had to prove by clear and convincing evidence that there was a reason to use a selection means with Hesser. And if you back up a step, that assumes that Hesser, although otherwise had everything that the 421 patent had to begin with, and there was at least conflicting testimony that it lacked the sensing means. There was testimony by our expert, and you could look at the Hesser reference itself. At most, it had a sensing means that was comprised of an inductive coil and an optical sensor. And that hybrid system is at most what they had. The defendants never argued that Hesser had the sensing means by obviousness. They said it was literally present. The jury was certainly entitled to disbelieve that when in fact it wasn't literally present. It had an inductive coil and an optical means, not a purely optical communications sensing means as was construed in the 421 patent. But even if you put that aside and say, okay, well, let's assume for the moment that But that was a means plus function. It was, but there's no equivalence as to the inductive coils and the optical sensors because the optical sensors cannot transmit power. They're not the same thing. There was evidence by our expert to that effect as well. With respect to the function of sensing? To the function of sensing and as to whether or not there was equivalence by the coils and the optical sensors. So there was certainly substantial evidence in that. But let's assume for the moment that Hesser otherwise had everything else. And what the defendants were trying to show was that there was a reason to use a selection means with Hesser. The defendants keep trying to show that it was a connection, some alternative ways of connecting. But the function wasn't connecting, it was selection. And that's important because what our inventors found was that by using a selection means with a sensing means, they could control the amount of battery life that was being depleted in these devices. And that was crucial to the commercial success of the invention and the commercial embodiment of it. And there was no reason to select in the Hesser reference because the Hesser invention was about devices being transported on a conveyor belt. They didn't have a battery life problem because the inductive coils would power up the cards as they went along the belt. No references, all the defendants showed at most was that multiplexers were known and that Hesser was known, but there was no connection of the two or no reason to combine them. No references taught that you should use a multiplexer in the way that the assist patent did to save battery life. That was not in any of the multiplexer references. It was not testified to by Dr. Alpert, the defendant's expert. It was not even on his chart. Dr. Alpert had this chart of all these supposed design factors pointing to whether or not you could use a multiplexer versus a bus. And first of all, he couldn't definitively say which way it pointed to when you tried to design a system like if you started with Hesser to design a wafer fab. But even apart from that, he never said that, never used battery life as one of the design parameters, which is exactly the reason why the inventors used that to solve this problem in the wafer fab where it was previously thought that you couldn't even automate something like that. For 20 years, nobody thought that you could automate the non-assembly line way of producing silicon wafers. It was a regular process where the steps were not in linear order. They were recursive steps. There were periods where the pods would have to sit on whip racks. They were carted around by human people, human operators, as opposed to an assembly line where you tried to- Right, but Hesser was not limited to the assembly line in its disclosure, at least, right? The defendants keep saying that it wasn't, but the fact of the matter is every place in the- every embodiment that Hesser described in the patent involved an assembly line. Even where they're talking about a flexible production line, flexible meant in the context of Hesser, they sort of clipped the quote in column two, lines one through five, I believe. They clipped the quote that says flexible production line, but then it goes on to say that examples are where there's a belt and there's a chain and all these things that certainly suggest that it was a linear conveyor type system. There was testimony by our experts and testimony by the witnesses that no one would have thought, no one of skill in the art would have thought to start with Hesser in the first place. Does that go to the scope of the prior art? I mean, it's not starting with Hesser. I mean, if it's within the scope of the prior art, then it is sort of deemed as a matter of law. Within the scope, but in terms of the question of whether or not there is a motivation or reason to combine it, to use it with the multiplexer references, that goes to that. And there was the- But that goes to whether, given that you start with the prior art, whether you combine X with Y, right? Not whether you would start, whether you would go to X in the first place, I think. Well, I think it's sort of a very close question of whether or not you start with it or whether or not you would seek to combine the two. A person of ordinary skill would not seek to combine the two because they wouldn't even think to use Hesser in the first place. But even if you assume that they started with that, there was no teaching that suggested that you would use a multiplexer to achieve the kind of battery life that they needed. And the defendants- There was commercial success of the patented product. It took the inventors four years to develop it. And when the product came out in the marketplace, it received acclaim. And if you look at the defense evidence, a lot of times you see criticism of somebody either of an award because it was old hat, it was obvious. But there was no such evidence of that. There was no criticism of the award. In fact, you look at the defendant's evidence. It was not about whether or not the patent was valid or obvious. It was about whether or not they could copy it. And they did.  because it thought that I had to- that that would be prejudicial because he had excluded willfulness. Let me get to one other point because I see that my time is running out. We never should have had to face this argument in the first place. If this Hesser was so obvious, surely the defendant's lawyers would have figured that out not 10 years into the case when they did. The Hesser reference was cited on the face of the patent. It was examined by the patent office. It's in the file history. It was used to reject other claims. It was staring them in the face all along. They didn't think of using a Hesser as a reference for obviousness until 10 years into the case. And surely if it was that obvious, they would have figured out that from day one. But instead they waited until well after the close of discovery, well after summary judgments had been made, well after the case had come up to this court twice on appeal, and then only after that did they come up with this- basically use the 421 reference as a checklist to go back and try to find everything that they could and try to cobble together some motivation to combine that really didn't exist. And we never should have had to face that after having made all the decisions tactically in the case that we did. We could have asserted narrower claims in the case. We could have gone to the 166 patent. We maybe would not have withdrawn that from the case. All these things go into your mind as a lawyer trying to simplify the case. And you can't undo that 10 years into the case. And I want to say it's important to us that the court also ruled on the double patenting because while there was a terminal disclaimer that we filed, the defendants assert that somehow it deprives us of our damages should everything else get unwound. And the double patenting just isn't there. Again, the district court committed the same error it did in prior cases where it read too many structures into the communication means limitation of Claim 8 of the 166. Instead of finding just the structures necessary for the communication, it found a sensing means, a selection means, a central processor, all of those things were not necessary to the communication means. And then it found based on the supposed disclosure of the communication means of all those other things, it found that the two claims read the same and therefore there was double patenting. And that's just not right. I'll reserve the rest for rebuttal. Thank you. Mr. Schroedien. May it please the court. The district court correctly ruled that substituting a multiplexer for the Buss and Hesser would have been obvious as a matter of law. The court held that the substitution was merely the product of ordinary skill and common sense. There's no dispute that a multiplexer was well known to those of skill in the art, there was no dispute that there were a finite number of ways to connect the central computer to the multiple devices around a fab, and there's no dispute that this implementation of connecting a computer to multiple devices was well within the level of skill of one of ordinary skill in the art. So substituting that multiplexer would have been obvious to try, particularly here where there's no evidence or suggestion that the multiplexer was working in an unexpected or unpredictable manner. So how do you respond to the argument that it took four years to develop using the multiplexer in this system? Your Honor, there's no evidence that that part of the design took that long. This is a sophisticated product that is attached, a tag, that's attached to the outside of one of these transportable containers. And developing the entire tag along with all the other Smith equipment and everything was what took the longer period of time. But isn't your position that everything else is in the prior art except what comes from Hesser? Yes, Your Honor. It's our position that Hesser discloses everything but the bus versus multiplexer as to what the claimed invention is. The product has more in it. There's more in the product. This tag has other functions and the ability to use a digital pad, et cetera, things that aren't in the claim. So the development of the product may have taken longer, but there's no testimony that the design going from a bus to a multiplexer was something that was difficult. In fact, Dr. Felais admitted that was something well within the level of skill of one of ordinary skill in the art. He was asked, would one of skill in the art have been able to take Hesser's system and substitute a bus for a multiplexer? And he answered, yes, they would have. So that substitution was within the level of skill of one of ordinary skill in the art. And as Judge Michel noted earlier in questioning Mr. Wu,  it's not a question of fact in which there has to be deference given to the jury. The deference is given to the jury in regard to the factual findings, and Judge Fogel recognized this, and that's exactly what he did in his order. He reviewed the factual findings first to see if they were supported by substantial evidence. Then he reached his ultimate conclusion. Now, as to the scope and content of the prior art, there's no legitimate dispute here that Hesser was outside the scope of the prior art. I'm sorry, everybody agrees that it's within, you're saying? Yes. Okay. It's outside. Sorry, I used a double negative. You caught me there. Dr. Felais was asked this question, a SIS expert, was it within the scope of the relevant art? He answered yes. But then he kept saying, but the person of skill in the art wouldn't have looked to this when trying to solve this problem of manufacturing semiconductor wafers. But the claims aren't limited to semiconductor wafers in any way. Well, I think Mr. Wu makes a point, and it seems to me that it has some force, that so assume away the answer to question one. You still have references to Hesser in the other question. Can't we regard those other questions as, in effect, being independent determinations in a world in which one assumes the applicability of Hesser as within the prior art and nonetheless concluding that Hesser was within the scope of the art? Well, the catch there, Your Honor, is the presuming that Hesser was within the scope of the art. The SIS says in its reply that the jury was expressly told to consider these questions separately. There's nothing on the verdict form that says that, and there was nothing in the judge's instructions. But if you look to the instructions the jury did receive on motivation to combine, they were given an instruction that the motivation can arise three ways. Number two says, in the knowledge of those of ordinary skill in the art, that certain references or disclosures in those references are of special interest or importance in the field. Well, if you've already decided Hesser isn't in the field, how could you say that it would meet that motivational requirement? Well, I mean, this may be a response that only a lawyer could feel comfortable with, but you could certainly say, if you were a juror, well, I've been asked in question three whether there's a motivation to combine Hesser with the prior art references, and therefore I'm being asked to make a determination independent of whether I think Hesser is prior art. And I answer that no. That answer, if in that sort of lawyerly way of parsing it, would it seem to me negate, at least to some extent, the effect of the jury having initially excluded Hesser from being within the prior art, don't you think? No, Your Honor. Actually, if you look at the previous question, prior art references, what we had originally submitted in the verdict form said multiplexer prior art references. Assist objected and said, well, those textbooks and all the other patents we submitted that were about multiplexers, they said those shouldn't be characterized as multiplexer prior art references. So that term came out. So prior art references refers to the references in question two. I understand. And the jury already said both of those are outside the scope of the relevant prior art. So in question three they're being asked, would one of skill and the art combine these irrelevant things with these irrelevant things? The question, you know, there's no other answer they could have said. And going back to the jury instruction, they were also asked about whether one of skill and the art would have been led to look to these references based upon the problem facing the inventors. Well, again, they already said an inventor wouldn't have looked to those because that was part of their determination of whether the reference was within the scope of the prior art. If it was something an inventor would have looked to, they would have said it was within the scope. But they had already said it wasn't something the inventor would look to. So I believe that those questions cannot be separated one from the other. And, in fact, all of the jury's other findings flowed from the fact that they found that Hesser and the multiplexer references were outside the art. It's funny. When we don't have special verdicts, sometimes we wish we did. And when we do, we often wish we didn't. Well, I think the verdict form we have here is very instructive because we can see where this jury went wrong. And they started down that path. And they said both of these things are irrelevant. And that led to the other findings they made. Now, as to the differences between the- It looks to me more like they decided who won and then worked backwards.  I could only speculate, Your Honor. As to the differences between the claim to invention and Hesser, Mr. Wu is contesting whether the sensing means was disclosed or Assist is contesting that issue. And there, Assist admits the same structure that constitutes a sensing means is disclosed in Hesser, the LED and photo transistor. Their argument is that first there's this power transfer to the tag and then communication occurs. But it's still the communication from the tag back to the workstation that notifies the workstation that there's a container there. And I'd like to point the court to an Assist brief on- Just a minute. On page 14 of Assist brief, their opening brief, they have a quote from Hesser there. And there's an ellipsis inserted into that quote. And that ellipsis is very important because that ellipsis is where Hesser says, after the tag is powered up, it communicates, sends a communication back to the workstation. And then the next sentence says, Station 19 now knows and recognizes that a workpiece carrier has arrived. So it's the communication that notifies the station. The station doesn't know that some tag was powered up. It knows when it receives a communication. So the sensing does occur by the photo transistor on the workstation receiving a communication. And this court may recall also in its last opinion in this case, we argued that there's a switch on the workstation. When a container comes along, the switch gets depressed. We then know there's a container there, and then communication occurs. And the court said that's irrelevant. If that switch performs the sensing, it's irrelevant because when communication occurs, you also sense. So here, even if somehow this coil did perform the sensing, when the devices subsequently communicate, they sense the presence. So we believe there's no genuine dispute, and Judge Fogle agreed with us. There's no issue as to the sensing being satisfied by Hesser. So with that resolved then, that leaves there's one difference, the bus for a multiplexer. And as we said, it was a substitution of one known device working in its known and predictable way. And though assist has argued about this unexpected result of battery life savings, no one disputes that the multiplexer works by routing a signal, has one signal coming in, and it routes it to one of its outputs. So it will only go to one communication device. That communication device will then communicate with the transportable container. There's no dispute about that. It works exactly as it would have been predicted, as it was expected. That's what multiplexers do. We introduced undergraduate textbooks, which are cited in our brief, that show that's what multiplexers do. They route signals to just one output. So with that understanding, Judge Fogle recognized that this was just a substitution of a known device working in its known and expected way. And it would have been within the skill of one ordinary skill in the art, and therefore, under KSR, the invention's obvious. Now assist makes a couple arguments to try and refute this. For example, saying there was teaching away. This is something that was raised in assist's reply brief. Now, it wasn't raised in assist's opening brief that there was any teaching away, because there was no finding of that. In fact, assist asked for a jury instruction that there was teaching away, and Judge Fogle rejected it because there was no evidence. And assist didn't appeal that ruling. But in their reply brief, they make an appearance that there was a finding of teaching away. And on page six of assist's reply, assist uses a crop quote. It talks about, assist says that the district court recognized that multiplexer references, let me find the quote. Here, in the middle of page six, assist says, while noting that none of the prior art references indicates the particular benefit of using a multiplexer in a system, and that, indeed, some of the references point away from using a multiplexer, well, that's not what the court said. The court said assist argues that. So there was no finding of this, and the court didn't agree with it. The court just simply said, this is assist's argument. So if you look back to the court's order, it's on page A6013 at line 19. The court just simply said, this is assist's argument. So there was no finding of teaching away. And that's very important here, because in several of this court's post-KSR rulings, it's looked to whether there was a teaching away, if there were a number of options. The court has looked at how many options were there available. Was it a limited number? Was it hundreds of millions, for example, in the Takeda case? And then the court has also looked to whether there was a teaching away. Here, there was no teaching away. There was no finding of a teaching away. There was no jury instruction teaching away, and no evidence of it. Now, assist also tries to refute the court's findings, or I'm sorry, the court's holding of obviousness, by arguing about this unexpected result of battery life savings. And again, this is something, Your Honor, that in the Northern District of California, there are, the model rule lists six different secondary considerations. Assist proposed giving the jury five of those. The one they did not want to be given to the jury, they didn't even ask the jury to be told about, was unexpected results. So the jury was never given an instruction about unexpected results, never made a finding about unexpected results. The whole issue of unexpected results was not mentioned in a single jury instruction anywhere. So assist can't support its arguments based upon this alleged unexpected results. Was there evidence or testimony on this issue? Actually, Your Honor, no witness ever said anything was unexpected. Assist tries to characterize, they say- I said on the issue of the battery life. They say- What way do you characterize it? Pardon me, Your Honor? Have I asked if there was any evidence or testimony on the issue of the battery life? There was testimony that there was battery life savings by assist inventor, but he never said it was unexpected, because as I said, everyone knows a multiplexer routes a signal to one output. He said there was battery life savings. He never said it was unexpected. He was the inventor. To him, perhaps it wasn't. The question is, would it have been unexpected to an ordinary person who wasn't an expert? And nobody, there was no testimony and no evidence that it was unexpected. No witness ever said it was unexpected. There's no evidence. Your side did not present such evidence or cross-examination? That the battery life savings was unexpected. That it was expected, that it was the standard consequence of this structure. We agreed with how the multiplexer would work, that it would route a signal to one output. The only dispute here was how the system in HESR would work, and the error there on the assist side is that their inventor said, when you communicate on a bus, you wake up everything that's on the bus. Now his error is, the transportable containers are not on the bus. They receive infrared communication from the communication devices that are on a bus. So if a signal goes out onto a bus, it may wake up each one of those infrared communication devices, but those are hardwired, they're not run by batteries. And then one of those devices will transmit to the container. So only one device will transmit, only one container will be awoken and use battery life. So there was a dispute about how the system in HESR would work, but there was no evidence that how the use of a multiplexer would work, that it would route a signal to just one device and just that one device would transmit. And as I said, assist witness said, you wake up everything on the bus, and therefore you wake up all the transportable containers. They're not on the bus. When assist expert witness got on the stand, he just said, well you heard Mr. Benora say there's battery life savings. So he just relied upon that mistaken testimony that containers are on the bus. Our expert walked through how the bus works and explained the containers are not on the bus, so there was no evidence whatsoever of any unexpected results. And there was no jury instruction of unexpected results, and there was no finding by any jury of any unexpected results. And importantly on this issue, in assist's own patent, they're trying to sustain the whole validity of this patent now, or this patent claim I should say, on the battery life. And if you look to column two at lines 37 to 41, assist itself says in its patent, the battery is optional. Assist itself in its own patent discloses you can power this tag through the same induction coil that HESR used. And if you look to figure five of assist's patent, it's almost identical to HESR. There's an induction coil, and there's a battery. And the induction coil powers things such as the microprocessor, et cetera. The battery is only used to power memory. It works just like HESR did. HESR had the induction coil where when you arrived at a workstation, you could receive power, and you had a battery for backup for things like memory. That's exactly what's disclosed in assist's patent. Then this entire argument just was created at trial purely out of the mistaken testimony of Mr. Benora that containers and HESR are on the bus, and therefore there was some alleged battery life savings. All right, time has expired, and we gave you some extra time. We'll hear a rebuttal now from Mr. Wu. Mr. Wu, in view of giving the other side some extra time, we'll restore the rest of your reserved rebuttal time. So you have up to five minutes. I appreciate that, Your Honor. Let me address the last point first. The tags are battery power. They are on the bus in that they are sitting opposite sensing means that would be all woken up or all pulled when a bus would have to send out a signal. So the bus sends out a signal to all the sensing means and all the battery operator tags opposite that would all have to wake up and respond in the bus system. And that was one of the problems that they had to solve. There was no – all that the defendant showed was that multiplexers were known, but there was no – Let me make sure I understand what the dispute is on this, because I don't think that Mr. Shavodian would agree with your characterization. And I guess it's left to us, assuming there is a dispute with you, to resolve. But my understanding of what he was saying was, look, it's true that on the bus, once you send a signal, everybody down the line has to be awake to see if that signal is for them. But when they figure out who it's for, then they communicate with the mobile unit and only the one for whom it was for communicates with that mobile unit and therefore all the other mobile units do not get turned on and do not use a battery. Is he right or is your characterization not different? That's what he's arguing. Right. But that presumes – the thing that's missing is that it presumes that each of the stations will have the smarts to know that that signal is for the particular tag that's opposite it, not for anybody else. Right. They don't know that because the sensing means it's just a sensing means. There's no smarts in there necessarily. It sits there and it just broadcasts whatever the bus gives it and says, you know, who's out there or this signal is for tag five. Where's tag five? And it goes to all hundreds or thousands or so of the tags that are – every single one of the sensing means will have to broadcast that to the tag to find out where that tag is. And then they all have to wake up to respond. And in Mr. Shavodian's system, which is not discussed either in HESR or the patent, those stations actually have smarts and they say, oh, I know it's for tag five and I know that tag five is opposite me. But the way that the patent solved that problem was to have a multiplexer have that knowledge instead of it being broadcast to all the tags. I think I understand where the dispute is. Okay. Okay. And, again, this also presupposes that somebody would know that, you know, yes, multiplexers were known in the art and people knew how to implement them to connect things together. But what wasn't obvious and what wasn't taught anywhere, and there's no suggestion anywhere, was that in order to save the battery life, that you had to do it as part of this very complicated system to automate in a wafer fab where you had irregular processing and so forth, that you could use a multiplexer in this way as a selection means in connection with the sensing means to save battery life. There was no suggestion by Alpert that you could do that, that it was known to somebody of ordinary skill in the art. In fact, our experts said just the contrary, that a person of ordinary skill could not know that you could use a multiplexer in this fashion to save battery life. I don't have the appendix site, but it's at 888 and 889 of the overall combined trial transcript. There was lots of evidence that battery life was really important. And, again, Dr. Alpert could not understand, and, again, by his sort of mistaken view of what the invention was, he couldn't understand how you could use a multiplexer to save battery life. So here's a person of more than ordinary skill, not knowing that you could use a multiplexer in this fashion. Of course it's not obvious. And, again, the standard on that question should be very low standard because we were the ones who won the jury verdict. I read his testimony that you referred to, and I may have misread it, but my take on it was that he was disputing the saving of battery life basically for the same reasons that Mr. Shavodian was suggesting, rather than that he didn't understand. I mean, even I can understand the battery life saving point, so I assume he could. But the point is he could not understand how you would implement it in that fashion in order to save battery life. He kept thinking, oh, well, you couldn't save battery life that way because you'd have smarts on the sensing means, and they would know. Well, that's Mr. Shavodian's point, but that's why there's not a difference between the savings and battery life, not that you don't have a conservation of battery life with the multiplexer versus a bus system that wakes everybody up on both sides of the communication. But the point is that people of ordinary skill would not think of that, and it took the inventors four years to figure this all out. It's not like saying, oh, I could take HESSER and I could modify it to save the battery life problem by using a multiplexer. There was no teaching of that, and there's nothing from Dr. Alpert to suggest that. And the jury certainly could have disregarded him. I mean, they put all their eggs in one basket. Dr. Alpert was their only witness on this point on the motivation to combine, and if the jury disbelieved him, then that should be enough to support that finding. And based on that finding, this case is so old that the only way to really guard against hindsight is to put it in the hands of the jury who gave it a fresh look and found, based on substantial evidence, that there was no motivation to combine. And indeed, unlike the situation where you don't know how strongly they believe that, you do have them, in this case, at defendant's request, answering the ultimate question of whether or not the assist patent was non-obvious, and they found that it was not obvious. All right. Thank you. You may feel under submission. All rise. The Honorable Court is adjourned until tomorrow morning at 10 a.m. Thank you.